IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA
    *Respondent*,

    v.

JACOBY WALKER,
    *Petitioner*.

Criminal No. ELH-18-0017

**MEMORANDUM OPINION**

Defendant Jacoby Walker has been in custody since January 31, 2018, on a drug conspiracy charge. He filed a pro se "Motion to Reduce Sentence," seeking compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF 689. Thereafter, through counsel, Walker filed a supplemental memorandum in support of defendant's motion (ECF 805), along with several exhibits. I shall refer to ECF 689 and ECF 805 collectively as the "Motion." The government opposes the Motion. ECF 837. Defendant replied (ECF 849) and provided additional exhibits. He also filed a supplemental reply. ECF 851.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.

**I. Background**

The defendant was one of eighteen people indicted on January 11, 2018. ECF 1. A nineteenth defendant was added in a Superseding Indictment filed on March 22, 2018. ECF 157. Of relevance here, defendant was charged in Count One with conspiracy to distribute and possess with the intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846. *Id.*

Walker entered a plea of guilty to that offense on April 5, 2019 (ECF 509), pursuant to a written plea agreement. ECF 512 (Plea Agreement). The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentencing range between 120 months and 144 months of imprisonment. *Id.* ¶¶ 9-10. Notably, the offense carried a mandatory minimum term of ten years' imprisonment, with a maximum of life imprisonment. *Id.* ¶ 3.

According to the Stipulation of Facts in the Plea Agreement, *id.* at 10-11, from at least March 2017 to September 2017, Walker was a member of the Transformers Drug Shop, which distributed heroin in the "Panyard" area of Baltimore. *Id.* at 10. During the Drug Enforcement Administration's investigation of the shop, phone calls were intercepted that established defendant's participation in the drug conspiracy. For example, investigators intercepted a call during which Walker checked on a street-level dealer's whereabouts. *Id.* Moreover, a pole camera was installed in the Panyard, which captured Walker, on several occasions, engaging in narcotics sales. *Id.* Further, Walker agreed that it was "reasonably foreseeable to him that members of the conspiracy would distribute one kilogram or more of heroin." *Id.*

The parties stipulated to sentencing guidelines that contemplated at least one kilogram of heroin. *Id.* ¶ 6(a). The Plea Agreement provided, *id.*:

> This Office and the Defendant further agree that the applicable base offense level is a level 30 pursuant to United States Sentence Guidelines ("U.S.S.G.") § 2D1.1(c)(5) to account for a conspiracy to distribute one kilogram or more of heroin.

Further, the Plea Agreement expressly provided that there was no agreement as to the defendant's criminal history and that the defendant's criminal history could affect his offense level. *Id.* ¶ 7.

The Presentence Report ("PSR," ECF 567) generally calculated Walker's sentencing guidelines ("U.S.S.G." or "Guidelines") consistent with the Plea Agreement. However, it

increased the defendant's base offense level from 30 to 37, because of a determination that Walker qualified for career offender status under U.S.S.G. § 4B1.1. *See id.* ¶¶ 14-23. In particular, Walker qualified as a Career Offender based on the underlying offense, coupled with three prior convictions for serious drug offenses. *Id.* ¶ 39.

After crediting Walker for acceptance of responsibility, he had a final offense level of 34, with a Criminal History Category of VI. *Id.* ¶¶ 23, 39. Thus, his Guidelines called for a period of incarceration ranging between 262 months to 327 months. *Id.* ¶ 65. If defendant were not a career offender, his final offense level would have been 27, with a criminal history category of IV, and Guidelines of 100 to 125 months' incarceration. But, because of the 10-year mandatory minimum, the Guidelines would have been adjusted to 120 to 125 months. *See* U.S.S.G. § 5G1.1(c)(2).

Sentencing was held on June 21, 2019. At the time of sentencing, the defendant was 44 years of age. ECF 567 at 3. He was taking medication for high blood pressure. *Id.* ¶ 56. In addition, the PSR noted that defendant had a long history of drug use. *Id.* ¶ 58.

The Court sentenced Walker to 120 months' imprisonment. ECF 589. That sentence corresponded to the bottom of the C-plea range and to the congressionally mandated minimum sentence.

No appeal was filed. But, Walker filed for post-conviction relief under 28 U.S.C. § 2255. ECF 678. He claimed that his lawyer was ineffective because, *inter alia*, he did not dispute the drug quantity. By Memorandum Opinion (ECF 852) and Order (ECF 853) of December 21, 2020, I denied post conviction relief.

Defendant is currently incarcerated at FCI Allenwood Low. He has served 37 months of his 120 month sentence, which amounts to roughly 31%. His full sentence expires in January

2028.  ECF 837 at 2 n.1.  With good conduct credit, he has a projected release date of August 2026.  ECF 805-3.

The defendant currently suffers from various health conditions, including Type 2 diabetes, hypertension, and obesity.  His Body Mass Index ("BMI") in 2019 was 34.6.  ECF 805-2 at 46.

The defendant made an administrative request for compassionate release in May 2020. ECF 805-1.  The Bureau of Prisons ("BOP") denied the request. *Id.*  The government concedes that the defendant has exhausted his administrative remedies.  ECF 837 at 2.

## II.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

4

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
> and that such a reduction is consistent with applicable policy statements issued by

the Sentencing Commission . . . .

Accordingly, in order to qualify for relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release.  *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."   U.S.S.G.   §   1B1.13   App.   Notes   1(A)-(D).

Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) **Medical Condition of the Defendant**.—
>
>> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is—
>>
>>> (I)  suffering from a serious physical or medical condition,
>>>
>>> (II) suffering from a serious functional or cognitive impairment, or
>>>
>>> (III) experiencing deteriorating physical or mental health because of the aging process,
>>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence.  Application Note 1(C) concerns Family Circumstances.  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The  BOP  regulation  appears  at  Program  Statement  5050.50,  Compassionate

Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205.  However, the Court may not rely on the Program Statement.  Rather, the Court must consider the Sentencing Commission's policy statements.  *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act.  Thus, it is only "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at *7; *see also United States v. Zullo*, 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283.  Therefore, district courts are "'empowered…to consider any extraordinary and

compelling reason for release that a defendant might raise.'"  *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).   But, compassionate release is a "rare" remedy.  *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III. COVID-19[1]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[2]   The World Health

---

[1] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[2] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).  Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*

That said, the COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393, (6th Cir. 2020).  Indeed, for a significant period of time, life as we have known it came to a halt.  Although many businesses and schools reopened for a period of time, many are again subject to closure or substantial restrictions, due to the virulent resurgence of the virus in recent weeks.

The Court must also underscore that the virus is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  To be sure, many people who are stricken with the virus experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted).  As of January 31, 2021, COVID-19 has infected more than 26 million Americans and caused over 441,000 deaths in this country.

*See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Jan. 31, 2021).

Unfortunately, there is currently no cure or proven treatment that is generally available for the virus. But, the country has recently seen the rollout of two vaccines for COVID-19 (Pfizer and Moderna). The vaccines initially were made available to health care workers and the elderly in nursing homes, but the category of eligible persons has expanded recently. Nevertheless, the rollout has not been as expeditious as had been hoped.

Notably, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) is "align[ed] with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Therefore, prisoners at heightened risk receive priority for receipt of the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of February 6, 2021, the BOP had 123,452 federal inmates and 36,000 staff. And, as of the same date, the BOP had administered 39,288 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Feb. 6, 2021).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that increase the chance of severe illness. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart

disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, and again on July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on November 2, 2020, to reflect the most recently available data, the CDC again revised its guidance.  *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.   According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; smoking; pregnancy; and Type 2 diabetes.  *Id.*  The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

In addition, the CDC created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include asthma, cerebrovascular disease, hypertension, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, overweight (where the BMI is between 25 and 30), pulmonary fibrosis, thalassemia (a type of blood disorder), and Type 1 diabetes. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).

12

Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2. Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id*.; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate themselves from others. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the BOP from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, the virus persists in penal institutions.[3]  As of February 6, 2021, the BOP reported that 2,205 inmates out of a total of 123,452, and 1,729 BOP staff, out of

---

[3] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.  *See Cases in Jails and Prisons*,

36,000, currently tested positive for COVID-19; 44,182 inmates and 4,497 staff have recovered from the virus; and 216 inmates and three staff members have died from the virus.  Moreover, the BOP has completed 102,082 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/ (last accessed Feb. 6, 2021).  *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

With respect to FCI Allenwood Low, where the defendant is a prisoner, as of February 6, 2021, the BOP reported that only two inmates have tested positive for COVID-19 and 287 inmates and 18 staff have recovered at the facility. There have been no reported deaths.   And, at the facility, 327 staff and 358 inmates have been fully inoculated.  *See* https://www.bop.gov/coronavirus/ (last accessed Feb. 6, 2021).

### IV.  Discussion

Walker has moved for compassionate release on the ground that his health conditions render him particularly vulnerable to COVID-19. ECF 805 at 3-6. In particular, Walker suffers from Type 2 diabetes, hypertension, and obesity. *Id.*

The government acknowledges that defendant's health conditions satisfy the extraordinary prong of the compassionate release analysis based on his Type 2 diabetes and his obesity.  ECF 837 at 8.  Nevertheless, it opposes Walker's release.  It maintains that Walker poses a danger to the community and the § 3553(a) factors militate against a reduction of his sentence. *Id.* at 9-12.

---

N.Y. TIMES (Oct. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems.*" America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

As indicated, Walker's medical records show that he currently has a BMI of 34.6. ECF 805-2 at 46. The CDC identifies obesity as a COVID-19 risk factor supported by the "strongest, most consistent evidence" drawn from multiple medical studies of the effects of the virus. *People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.  Further, the CDC cautions that the "more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

Numerous courts have found that, in light of the COVID-19 pandemic, serious chronic medical conditions, including obesity, hypertension, and diabetes, qualify as compelling reasons for compassionate release. *See, e.g., United States v. Staten*, PJM-01-284-4, 2020 WL 4904270, at *2 (D. Md. Aug. 18, 2020) (finding an "extraordinary and compelling reason" for compassionate release based on a BMI of 38); *United States v. Williams*, PWG-19-134, 2020 WL 3073320 (D. Md. June 10, 2020) (finding obese defendant with a BMI of 32.5 qualified for compassionate release in light of COVID-19); *United States v. Patterson*, TJS-20-1078, 2020 WL 2217262, at *3 (D. Md. May 7, 2020) ("There is ample evidence that people with hypertension are more likely to experience complications if they become infected with COVID-19"); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and

compelling reason).

Accordingly, I am satisfied that Walker has satisfied the "extraordinary and compelling" prong of the § 3582 analysis. This determination does not end the inquiry, however.

Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

In addition, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Walker underscores that his offense "involved neither weapons nor allegations of violence." ECF 805 at 11. He also highlights his participation in educational programming while incarcerated and his lack of disciplinary infractions. *Id.* at 12.

In addition, defendant essentially asks the Court to revisit the Plea Agreement in light of a subsequent change in the law. He points out that after he was sentenced, the Fourth Circuit held in *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019), that drug conspiracy offenses, including the offense that gave rise to Walker's sentence, do not constitute predicate offenses for purposes of career offender status. ECF 805 at 12-13. Walker states that his "plea negotiation

process would have likely looked much different" if he had not been "facing increased career offender penalties." *Id.* at 13

Indeed, at the time of defendant's offense, conspiracy to distribute a controlled substance under 21 U.S.C. § 846 was considered a career offender predicate offense under U.S.S.G. § 4B1.2(b). But, in *Norman* the Fourth Circuit determined that federal drug conspiracy under 18 U.S.C. § 846 is categorically not a qualifying offense for career offender purposes. *See Norman*, 935 F.3d at 237-39.

The government does not respond to the defense argument regarding *Norman*, 935 F.3d 232. Rather, the government urges the conclusion that Walker "would continue to pose a danger if released prematurely." ECF 837 at 9. In support, the government emphasizes the nature and circumstances of the underlying offense as well as defendant's extensive criminal history. *Id.*

I agree that Walker would no longer qualify as a career offender, in light of *Norman*. But, I also agree with the government that the nature of Walker's offense and his criminal history weighs heavily here. Defendant conspired to distribute a least a kilogram of heroin, for which he faced a mandatory minimum sentence of at least ten years' imprisonment. And, significantly, the government alleged that Walker played a leadership role in the offense. *Id.*

If defendant were not deemed a career offender, he might have had a final offense level of 27 and a criminal history category of IV. *See id.* ¶¶ 14, 19, 38. If so, the Guidelines would have called for a sentence ranging from 100 to 125 months. But, in view of the mandatory minimum, the Guidelines would have been adjusted to 120 to 125 months. *See* U.S.S.G. § 5G1.1(c)(2).

However, the government might have also sought a role enhancement under U.S.S.G. § 3B1.1(a) or (b), which could have added at least three levels to the offense level, and up to four

levels.  If three levels were added, the final offense level would have been 30.  And, with a criminal history category of IV, the Guidelines would have called for a sentence of 135 to 168 months of imprisonment.  With an upward adjustment of four levels, the Guidelines would have been 151 to 188 months.

Moreover, Walker has an extensive criminal history. Between 2000 and 2015, defendant was convicted of seven drug offenses. ECF 567, ¶¶ 26, 28, 29, 34, 35, 36, 37. He was also convicted of handgun possession in 1997 and second degree assault in 2003. *Id.* ¶¶ 27, 30. And, the criminal justice system was consistently lenient with the defendant; he received multiple suspended or short sentences. *See, e.g., id.* ¶¶ 26, 30, 34, 35, 37. Yet, defendant continued down the wrong path.

### V.  Conclusion

The serious nature of the underlying offense, coupled with defendant's prior criminal record, readily justified a ten-year sentence, in light of the factors under 18 U.S.C. § 3553(a). Given the abbreviated time that defendant has been incarcerated, the Court concludes that release under 18 U.S.C. § 3582(c)(1)(A) is not warranted at this time.

For the forgoing reasons, I shall deny the Motion (ECF 689, ECF 805), without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date:   February 9, 2021                              _____/s/_____
                                                     Ellen Lipton Hollander
                                                     United States District Judge